UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TARAMATTIE DOUCDETTE,
ROBERT DOUCETTE, INDIVIDUALLY
AND AS NEXT FRIEND OF CHRISTOPHER
DOUCETTE, SEAN DOUCETTE, AND
PATRICK DOUCETTE,
        PLAINTIFFS

VS.                              CIVIL ACTION NO. 04-10960-RBC

PANERA, INC.,
        DEFENDANT

### PLAINTIFFS' MOTION IN LIMINE REGARDING TESTIMONY OF PAULA HOVEY, R.N.- PART I

Now come the plaintiffs and move this Honorable Court in limine to order the defendant not to make any reference, by way of argument or testimony, to the "pain assessment upon discharge" signed by Paula Hovey, RN, dated November 19, 2001, and included in the records of the Salem Visiting Nursing Association; plaintiffs state as grounds that the circumstances under which said "pain assessment upon discharge" was written or filled out by Ms. Hovey are extremely ambiguous, and it would be unfair and prejudicial to plaintiff Taramattie Doucette for the defendant to bring the contents of said "pain assessment upon discharge" (Exhibit A, attached) to the attention of the jury.

Ms. Hovey was deposed on April 11, 2005. At first, she testified in response to the defendant's counsel's questions, in the following manner:

p.41-42: "Q. So this is the pain assessment upon discharge, is that right?

    A. Yes.

    Q. And it's dated 11/19/01. Would that have been after her final, your final visit?

A. Yes.

Q. In it, she indicates that the pain at worst is to 9 plus. Can you explain why the pain actually went up one or even more than one since the initial visit?

A. She still had pain. She still stated she had pain.

Q. Did you notice during your visits there as the days went by that her pain level was increasing?

A. She said she still had pain."

......

p.43 – "Q. As a matter of fact, with respect to the frequency of pain that's on that same page, it no longer is marked constant; but rather, daily and intermittent. As I reading that correctly?

A. Yes.

Q. Is that based on not just what she said but also what you noticed?

A. Yes.

Q. And with respect to the quality of pain, that seems to have changed as well from a stabbing and throbbing, which is marked on Page 2, to a sharp and stabbing that's marked on the first page upon discharge. Am I reading that correctly?

A. Yes.

Q. And is that based on what she was telling you?

A. Yes.

Q. So looking at Subsection F in which the numbers listed are 4,4,2,2,4, after your treating her for five days, her pain level cut in half, even more than half from your initial visit; isn't that fair to say?

A. Yes.

Q. Can you please explain why her pain level dropped so dramatically after your five days of treating her

A. She said she still had pain.

Q. Right. But you'll concede that—

A. From examining her and from visiting her and from talking to her, those are the levels that I put down. But when I ask someone what their intensity of pain is, I put down what she tells me. And she told me she had a lot of pain. So I have to put down what someone tells you.

Q. Sure, So in Subsection F where it says 4,4,2,2,4, right, these are the pain levels that Mrs. Doucette told you?

A. She tells me, and I also—right. And I also, with the two of us, with the two of us also, I mean, I look at what she's doing also. I kind of can look at what she's doing also. But she tells me."

.....................

p. 48 – "Q. Is there anywhere in your, in the nurse's notes in which you would write down what the pain level was based on your observations and your working with her and not based on your discussions with her and her statements that it was an 8 or 9?

>   A. So in my words, would I put down what her pain level was, like, in my words?
>
>   Q. Yes.
>
>   A. I don't think so. I don't recall. I don't think I would do that.
>
>   Q. So what looks, what's staring at me at least on this particular Exhibit 1 is all these designations of 4's and 2's on the pain scale; and below, she writes, 9,9 plus with respect to the intensity of pain. Can you please explain that discrepancy?....
>
>   A. Again, that's just what she's telling me. That's just her level of pain that she's telling me. I mean, if a patient's telling me that's her pain level, that's what I have to go by. I mean, I'm not going to write somewhere what I think someone has for pain. I mean, I can write all I want that someone's not having pain, but it's what she's telling me.
>
>   Q. And so it was what she was telling you that made you write down at the bottom here in Subsection F...that's a 4,4,2,2 and a 4?
>
>   A. Right. ....."

By the conclusion of Ms. Hovey's deposition, it was clear that Ms. Hovey actually had no memory of speaking to Mrs. Doucette on 11/19/01, that the last skilled nursing visit by any visiting nurse was on 11/18/01, and that Ms. Hovey's last visit with Mrs. Doucette was 11/16/01. Further, Ms. Hovey has no memory of how she put together the "final discharge report" dated 11/19/01.

   Depos. P. 57 – 58

"Q. I just want to show you one other progress report addendum. It looks like it's dated November 19th in which it says, 'Received a message from patient's SP.' Could you please tell me what this particular report says?

A. 'Received message from patient's spouse that patient saw MD...11/19, and skilled nursing visits were no longer needed. Discharge from skilled...S, Salem Visiting Nurse Association, with last skilled nursing visit 11/18/01.'

..........

p.59-

Q. So when you put together this, what's been marked as Exhibit 1, the final discharge report, is that done on your last visit?

A. Not the last visit. I usually – it depends. She was not - - I did not discharge her at the house. I discharged her I think by telephone or by talking to her. I can't recall. I don't remember.

Q. Would you ever have put together that particular report...the discharge pain assessment summary, would you have ever done that without consulting the patient?

A. No. No, I would talk to her. I had talked to her about discharging her and everything. I remember because she thought she was going to stay on a little bit longer, and I talked to her. I said if the doctor signed the discharge order, I wouldn't be coming back. So we planned on that I probably would discharge her, and we talked about it.

Q. Okay. **Do you specifically remember talking to her and filling out this particular pain assessment form with her?**

    A. **I don't remember. I don't remember. It's too long ago.**

……..

p. 60-

    Q. So between the 13th and the 19th, you treated Mrs. Doucette everyday but for the 17 and 18t$^{h;}$ is that right?

    A. Yes.

Since the witness has no memory of the process by which she produced the "final discharge report," and has no memory of speaking with Mrs. Doucette in the process of preparing the "final discharge report," Ms. Hovey should not be allowed to testify regarding the "final discharge report," and the defendant should not be able to refer in any manner to this document, or be able to argue or elicit testimony regarding the contents of this document. It would be quite unfair and prejudicial to the plaintiff for Ms. Hovey to attribute the contents of the "final discharge report" to statements from Taramattie Doucette, when it is totally unclear whether Mrs. Doucette ever made any such statements.

                                          Respectfully submitted,

                                          For the plaintiffs

                                          */s/ Margaret A. Barmack*

                                          Margaret G. Barmack
                                          BBO No. 029660
                                          Barmack & Boggs
                                          41 Ocean Street
                                          Lynn, MA 01902
                                          Tel. 781-596-2540

## Certificate of Service

I, Margaret G. Barmack, hereby certify that the within motion in limine was served on the defendant by facsimile, email and mailing postage paid on even date to Atty. Christopher Sullivan, at Davis, White & Sullivan, One Longfellow Place, Suite 3609, Boston, MA 02114.

Date: 9/21/05

*[signature]*
Margaret G. Barmack

Exhibit A

Pain Assessment

Patient label here
Last name: Doucette,
First name: Jeannette
ID#: 317713
SOC: 1/13/01

Date: 1/15/01

Complete form: on admission, ROC, recert, D/C.
All other assessments to be documented on existing progress notes.

What pain scale is being used?: ☑ VAS (0 -10)   ☐ Wong-Baker
Other _____

A. Does patient have any type of pain? ☑ Yes  ☐ No
   If yes: continue

B. Location of pain:
   (Will need to use progress note if more than one source of pain)
   ® foot heel & 0
   L° burn

C. Intensity of Pain       worst: 6-8
   (use same scale each    best: 2
   visit)

D. Frequency of pain:
   1. ☐ daily          ☐ several x wk      ☐ weekly
   2. ☑ constant       ☑ intermittent

E. Quality of Pain: ☐ ache   ☐ dull      ☐ crampy
                    ☑ sharp  ☑ stabbing  ☐ throbbing

F. Does pain effect ability to function: ☑ Yes  ☐ No
   If yes, indicate pain score below

   | | |
   |---|---|
   | 1. ADL's | 4 |
   | 2. Physical Activity | 4 |
   | 3. Eating/Food Prep | 2 |
   | 4. Rest/Sleep | 2 |
   | 5. Homemaking | 4 |

G. What relieves the pain?
   ☑ rest     ☐ exercise   ☐ medication
   ☐ heat     ☐ cold       ☑ relaxation
   Other: _____

H. Quality of Life
   Does pain effect:
   concentration/mood    ☑ Yes  ☐ No
   enjoyment of life     ☑ Yes  ☐ No
   appetite              ☑ Yes  ☐ No

I. Patient Goal:
   1. What level of pain is acceptable?
      0 – 10  2   Wong-Baker:
   2. Is pain relief an issue to be addressed  ☑ Yes  ☐ No
      during this episode of care?
   3. What will improve function, activity level or
      Quality of Life?

@ 1/15 MD want pt instructed
to D/C Darvocet + cont
using E.S. Tylenol
2 tabs as
ordered

Clinician Signature: Paula C Nguyen

* Put medications on med sheet
* Put outcomes on 485/487

N:\CAROLB\OFFICE97\WRDSTART\WORDFORMS\Pain Assessment.doc
VNA:148     Originated 9/2001

WHITE COPY – MEDICAL RECORDS       YELLOW COPY – HOME RECORD