**Page 1**

```
              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS

                 Civil Action No. 04-10960-PBS

*******************************
TARAMATTIE DOUCETTE,          *
ROBERT DOUCETTE, INDIVIDUALLY *
AND AS NEXT FRIEND OF CHRISTOPHER *
DOUCETTE, SEAN DOUCETTE AND   *
PATRICK DOUCETTE,             *
                 Plaintiffs   *
                              *
        vs.                   *
                              *
PANERA, INC.,                 *
                 Defendant    *
*******************************

      DEPOSITION OF PAULA CHILDS HOVEY, a
witness called on behalf of the Defendant, taken
pursuant to the provisions of the Federal Rules
of Civil Procedure, before Christine L. Warwick,
a Registered Professional Reporter, Certified
Shorthand Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at Salem
Hospital, North Shore Medical Center, Davenport
Building, Salem, Massachusetts, on Monday,
April 11, 2005, commencing at 10:30 a.m.


                COPLEY COURT REPORTING
                  101 Tremont Street
                Boston, Massachusetts 02108
                    (617) 423-5841
```

**Page 2**

APPEARANCES:

DAVIS, WHITE & SULLIVAN, P.C.
(Joseph A. Merlino, Esquire)
One Longfellow Place, Suite 3609
Boston, Massachusetts 02114
Counsel on behalf of the Defendant

BARMACK & BOGGS
(Margaret G. Barmack, Atty-at-Law)
41 Ocean Street
Lynn, Massachusetts 01902
Counsel on behalf of the Plaintiffs

PARTNERS HEALTHCARE SYSTEM, INC.
(Joshua L. Abrams, Esquire)
50 Staniford Street, Suite 1000
Boston, Massachusetts 02114-2521
Counsel on behalf of Paula Childs Hovey

ALSO PRESENT:

Joanne Powers, RN, BSN, Partners Home Care

**Page 3**

INDEX

| Witness: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| PAULA CHILDS HOVEY | | | | |
| (By Mr. Merlino) | 4 | | 67 | |
| (By Ms. Barmack) | | 61 | | |

EXHIBITS

| Exhibit No. | | Page |
|---|---|---|
| 1 | Two-Page Pain Assessment Document | 20 |
| 2 | VNA of Greater Salem Progress Report Addendum | 20 |
| 3 | Records from North Shore Medical Center | 63 |

**Page 4**

PROCEEDINGS

MR. MERLINO: Shall we do the usual stipulations?

MS. BARMACK: That's fine.

MR. MERLINO: And read and sign the transcript?

MR. ABRAMS: I mean, I don't want to order one. I don't really want to have to have her go in. Basically, it's a question do you want to read and approve your deposition?

My guess is it's not going -- I mean, we can have it in there, but we're going to end up waiving it. Why don't we have it in there for now in case this goes in an unusual direction.

MR. MERLINO: And then waive the notary?

MR. ABRAMS: That's fine.

MR. MERLINO: 30 days, is that long enough?

PAULA CHILDS HOVEY, of lawful age, being first properly identified and duly sworn, deposes and says as follows in answer to direct interrogatories

BY ATTORNEY MERLINO:

Q. Good morning, Miss Hovey.

Page 5

1   A. Good morning.
2   Q. My name is Joseph Merlino. I represent the
3      defendant in this action, Panera Bread. I have
4      just some questions to ask of you of treatment
5      that you provided to Miss Taramattie Doucette who
6      is the plaintiff in this action.
7         If I ever ask you a question that may
8      seem confusing or just phrased rather awkwardly,
9      please let me know, and I'll be more than happy
10     to rephrase it. If at any time you answer a
11     question, it's going to be assumed that you
12     understood what the question was, okay?
13  A. Yes.
14  Q. Okay. And one other thing I was going to say as
15     well, because this is being recorded, and later on
16     down the line we're going to need to review the
17     transcript, it's very important that the record is
18     very clear and that all your responses are verbal.
19        Therefore, any head nod or shrug of the
20     shoulders, things of that nature cannot be
21     recorded. So that's why it's very important that
22     each answer be verbal. Is that okay?
23  A. Yes, yes.
24  Q. If at any time you need a break and there's not a

Page 6

1      question posed in front of you, just let me know.
2      We'll be more than happy to take a break, okay?
3   A. Yes.
4   Q. Can you please state your full name for the
5      record?
6   A. Paula Hovey.
7   Q. Can you please spell your last name?
8   A. H-O-V-E-Y.
9   Q. And where do you live?
10  A. 52 Hobart, H-O-B-A-R-T, Street in Danvers,
11     D-A-N-V-E-R-S, Mass. 01923.
12  Q. How long have you lived there?
13  A. Eight years.
14  Q. Do you have any intentions on moving anytime soon?
15  A. No.
16  Q. And are you married?
17  A. Separated.
18  Q. Do you have any children?
19  A. No.
20  Q. And where were you born?
21  A. Methuen.
22  Q. When was that?
23  A. 3/29/59.
24  Q. Who do you presently work for?

Page 7

1   A. Partners Home Care.
2   Q. How long have you worked for Partners Home Care?
3   A. Since 1992.
4   Q. And you are a registered nurse?
5   A. I am.
6   Q. Can you briefly tell me your educational
7      background?
8   A. I have a degree in business from Salem State
9      College. I have an associates degree in nursing
10     from North Shore Community, and I have a bachelors
11     in nursing from Salem State College.
12  Q. Can you tell me each one, when you received the
13     degrees?
14  A. Salem State, the business degree was in -- oh,
15     gosh, I want to say '81. And I want to say the
16     nursing degree from North Shore Community was '87.
17     And I want to say the Salem State nursing degree,
18     the bachelors was '91. Nights, I went back nights
19     for my bachelors in nursing.
20  Q. Was it shortly after you received your bachelors
21     at Salem State in '91 that you worked for Partners
22     Home Care?
23  A. Yes, it would have been.
24  Q. Before Partners Home Care --

Page 8

1   A. Let me just -- can I clarify something?
2   Q. Certainly.
3   A. I believe -- I worked for Charter Professional
4      from I believe '92 to '94. And then I started
5      Partners Home Care, I believe, '94, I think. I
6      think I just got my ten-year -- I think I'd just
7      been ten years with Partners with the visiting
8      nursing.
9         So I worked with Salem Hospital. It's
10     been longer than ten years with Salem Hospital.
11     But with Partners, it was ten years because I
12     worked for Charter before that. I was with a
13     doctor's office before that. I've been with
14     Salem Hospital for longer, but the visiting
15     nurses for ten years.
16  Q. Charter Professional --
17  A. Charter Professional is part of Salem Hospital.
18     It's a physician's office. It's part of the
19     hospital. They own the hospital -- they own the
20     physician's offices.
21  Q. Was there one particular physician --
22  A. Mauri Cohen. It was Beacon Medical.
23  Q. And what did you do there between '92 and '94?
24  A. It was, like -- I'm sorry, I don't know the dates.

9

1   It was, like, '91, '92 I was an office nurse. And
2   then they laid off the RN's in the offices, and
3   they hired medical assistants. Then I transferred
4   over to become a visiting nurse.
5   Q. And before Charter Professional, where did you
6      work?
7   A. I worked at Beverly Hospital.
8   Q. Do you remember what years that was,
9      approximately?
10  A. Gosh, it was, like, '87 to, like, '91.
11  Q. What did you do there?
12  A. I worked on a cardiac floor.
13  Q. And you were a nurse on there?
14  A. Yes. It was a cardiac floor. It was part
15     telemetry and also part med-surge.
16  Q. What type of physician was Mauri Cohen?
17  A. An internist.
18  Q. And before working at Beverly Hospital, do you
19     remember where you worked before then?
20  A. I was -- well, I wasn't a nurse before then. So I
21     went back -- so when I worked in the emergency
22     room part-time while I was in school, I worked as
23     a secretary in the emergency room while I was
24     going to school. And then when I got out of

10

1   school, when I became a nurse, I transferred up to
2   one of the floors and started working as a nurse.
3        Then I also worked for a doctor's office
4   as an office manager prior to that, before I was
5   a nurse for David St. Pierre. He's an orthopedic
6   surgeon. That was prior to becoming a nurse. So
7   that would have been in the eighties.
8   Q. He was an orthopedic surgeon?
9   A. Mm-hmm. Yes.
10  Q. Where is he located?
11  A. 4 State Road in Danvers, Mass.
12  Q. Now, did you need to take any special training
13     prior to working for Partners Home Care?
14  A. Did I -- courses, regular courses to be updated,
15     like courses that they give us. I'm trying to
16     think. They give wound care courses, IV courses,
17     just regular courses to stay updated.
18  Q. This is Partners Home Care?
19  A. Mm-hmm.
20  Q. Approximately, how many people work for Partners
21     Home Care, do you know?
22  A. I don't recall. I don't know.
23  Q. But they actually run the courses, themselves?
24  A. They don't run the courses. I mean, I don't have

11

1   to take any courses. But we are required to be
2   updated on a -- like, first we're required to keep
3   up to date on things such as diabetes and keep our
4   monitors up to date or our dressings, our wound
5   care. Things like that we're required to be up to
6   date on. And also, for our license, we're
7   required to be up to date, the CEU's.
8   Q. What does that stand for?
9   A. The continuing education credits, we're required
10     to have so many per year, every two years for our
11     license.
12  Q. So how many times a year do you take a particular
13     course to stay up to date?
14  A. We have to have 15 units every two years, 15
15     credits every two years. So it depends on how
16     many credits, how many courses you want to take,
17     how interested you are. It depends on the nurse
18     also. I mean, I do a lot of reading. I get a lot
19     of journals. I like nursing. I get a lot of
20     journals. I do a lot of reading.
21  Q. Now, have you taken any courses with respect to
22     treatment of burns or burn injuries, things of
23     that nature?
24  A. Not any wound care in particular. We've had

12

1   courses, companies that have come to the visiting
2   nurses that have gone over wound care and
3   different types of treatment for wound care. But
4   I've never probably gone to a course that I've sat
5   through on wound care.
6   Q. Do you ever recall there being offered any
7      particular course with respect to burn victims or
8      burn injuries?
9   A. I don't recall.
10  Q. Would that sound like a particular course, or is
11     that too narrowly tailored or too specific for the
12     types of courses that you're familiar with?
13  A. We have a wound care nurse. I don't know at that
14     time if we had a wound care nurse. But there are
15     wound care nurses that would go out and see a
16     patient if we felt it were necessary.
17  Q. Okay. And with respect to Mrs. Doucette, she
18     would fall within that particular umbrella, that
19     it was a wound care type of patient; is that
20     right?
21  A. I only saw her for five days. It was pretty
22     straightforward, I mean, her burn, the treatment.
23     She was under a doctor's care. It was the five
24     days. So the treatment we were ordered, I mean,

**13**

1  I -- she saw the doctor, and then I saw her. So I
2  was doing what the doctor ordered.
3  Q. Now, prior to coming here today to provide
4     testimony, did you review any documents in
5     preparation?
6  A. Just my notes I reviewed. I just went through
7     them briefly.
8  Q. And other than speaking with your attorney,
9     Mr. Abrams that's here today, did you talk to
10    anyone else about this particular case prior to
11    today?
12 A. No.
13 Q. Do you know if you received any phone calls from
14    anyone from my office or Attorney Barmack's office
15    asking about this case?
16 A. No, no.
17 Q. Just to make sure that the record is clear, just
18    make sure that I'm done asking the question before
19    you answer it; or when this transcript is actually
20    written, there will have to be ellipses, and it
21    won't look that clean. I'll just ask you to make
22    sure I finish the question before you answer,
23    okay?
24 A. Okay.

**14**

1  Q. Okay.
2  A. Sorry.
3  Q. It's okay.
4         MS. BARMACK: That wasn't a question.
5     That was a statement.
6         MR. MERLINO: That was a statement.
7  Q. Other than reviewing your notes, do you know if
8     you looked at anything else in preparation for
9     today?
10 A. Can you rephrase that?
11 Q. Do you remember reviewing or looking at anything
12    else prior to coming here today that was in
13    preparation for this particular --
14 A. I didn't, no.
15 Q. Other than the notes that you referred to?
16 A. Right, no.
17 Q. And how is it that you first came upon
18    Mrs. Doucette? How did that assignment come
19    about, do you know?
20 A. I just will get assigned a patient from my
21    supervisor. They just will assign a patient. At
22    the time, it might have been geographically. I
23    tend to do -- I do Swampscott, Marblehead, Salem.
24    That's my area.

**15**

1  So when a patient comes on, depending on
2  my caseload, I will just get assigned a patient
3  in that location.
4  Q. And prior to seeing a particular patient, are you
5     given any other medical records to review in
6     preparation for that first assessment?
7  A. We get a copy usually either from the emergency
8     room or from -- if they were in the hospital,
9     we'll get a copy of their history and physical and
10    their treatment. Or from the doctor's, they'll
11    fax over -- if they were treated at the doctor's
12    office, we'll get a fax from the doctor, what
13    their treatment was or what was done or what the
14    doctor wants us to do.
15 Q. And is there a particular type of patient that
16    would require your types of services? Why would
17    they ever retain you as a nurse? Let me somehow
18    clarify that.
19        Does the patient have to be a
20    particular, have a particular level of disability
21    to require your services, or is it by their
22    request? How does that work?
23 A. I would assume -- I'd have to be an RN, for one.
24    But I mean, other than having knowledge, I think

**16**

1  just an RN in wound care and my knowledge as an RN
2  and being able to treat her, I don't think I need
3  any other special -- I don't understand what
4  you're saying, I guess.
5  Q. With respect to the patient, what factors enter
6     the decision that a nurse would need to go to
7     their particular house to help them out? Is there
8     any particular -- why would you be called to help
9     her out at her house?
10 A. I don't understand. I guess I don't understand
11    what you're saying. I'm sorry.
12 Q. No, it's okay. I don't think you're the only one
13    who might be confused. So don't worry about that.
14        Anyway --
15 A. Are you saying why does she need a nurse?
16 Q. Yes. That's an easier way of asking it, yes.
17 A. Because of the degree of the burn, for pain
18    management, to educate her regarding the dressing
19    change, to educate her for signs and symptoms of
20    an infection.
21        It was a large burn, to educate her and
22    the spouse regarding the, you know, the treatment
23    of the -- signs to look for for infection, of the
24    type of dressing and the treatment of how to

**Page 17**

```
 1    change it; if necessary, pain management.  Pain
 2    was a big issue with her; the medication, you
 3    know, side effects of the medication.  She had a
 4    lot of side effects from it.
 5         And I think probably pain management,
 6    signs, symptoms of infection and the dressing
 7    change, that is what I'm out there for, elevating
 8    the foot, that type of thing.  That's what they
 9    needed a nurse for.
10 Q. And before going to see Mrs. Doucette on the first
11    occasion, what did you know of her particular
12    injury?  Do you remember how she injured herself?
13 A. I don't recall.  I don't recall.  I know she had a
14    burn, and then I -- you know, I believe -- I don't
15    recall until I got out there.
16 Q. And she lived in Swampscott at the time?
17 A. Yes.
18 Q. I'm just going to show you what's been marked as
19    Exhibit 7 in Miss Doucette's deposition.  I'm
20    showing you page, the second page of a two-page
21    exhibit.  Could you please take a look at that and
22    tell me what that is?
23         (Witness perusing document.)
24 A. I'm sorry, what --
```

**Page 18**

```
 1         MR. ABRAMS:  Just wait until he asks you
 2    something.
 3         THE WITNESS:  Oh.
 4 Q. Is that your signature at the bottom of it?
 5 A. Yes.
 6 Q. Is this a document you fill upon admission?
 7 A. Yes.
 8 Q. And is that your handwriting on it?
 9 A. Yes.
10 Q. Do you know when you filled this document out?
11 A. I believe it was the day of the 13th.  It would
12    have been the day of admission.
13 Q. And would this have been done at her home?
14 A. Yes.
15 Q. Now, looking at the top of the page, I see -- it
16    says, "What pain scale is being used?"  Can you
17    please describe the difference between what's
18    designated as VAS and what's designated as
19    Wong-Baker?
20 A. I don't know.  I can't answer that.  I know VAS
21    means the scale is 1 to 10.  I don't know the
22    Wong-Baker.  I know the 1 to 10.  I know 10 is the
23    worst pain you've ever had, and zero is no pain.
24 Q. Is that how you describe it to your patients?
```

**Page 19**

```
 1 A. Yes.
 2 Q. And secondly, it says, "Does the patient have any
 3    type of pain?"  You checked off yes?
 4 A. Yes.
 5 Q. Is that based on questions that you asked of the
 6    patient?
 7 A. Yes.
 8 Q. And also, does that say -- I imagine that's second
 9    degree burns?
10 A. Right.
11 Q. And it says right foot?
12 A. Right.  Yes, yes.
13 Q. What can you tell me about her injury and your
14    observations that you made of it during that
15    initial assessment, do you recall?
16 A. Are you asking me what the burn looked like?
17 Q. Yes.
18 A. She had a large, it was like an 8 by 10 centimeter
19    on one side of her foot, large fluid-filled
20    blister burn on one side.  And on the other side,
21    it was, it went around the side of her foot and
22    the back.  It went up the heel, and it went to the
23    other side of her foot.  But she had, like, a
24    large sack-filled blister.
```

**Page 20**

```
 1 Q. And so where was that large blister located
 2    exactly?
 3 A. Right around, like, where the top of a sneaker
 4    would be, where a sneaker would be, the top,
 5    because that's where her burn was, right along the
 6    top of her foot.  And it was like a large -- I
 7    have a picture of it, in fact, in one of the
 8    notes.
 9         I drew a picture in one of the notes
10    with the drawing and with the measurements in one
11    of the notes that I can show you.  It's an
12    addendum in there with the measurements.  I think
13    you just went by it, yes.  And you can look at
14    that.
15         MR. MERLINO:  Firstly, if we can have
16    this marked as Exhibit 1.
17         (Documents were marked as Exhibit Nos. 1
18    and 2 for identification.)
19 Q. I'm showing you what's been marked as Exhibit 2.
20    Is that the document that you were just referring
21    to?
22 A. I believe -- yeah, that's probably one of them.  I
23    may have drawn several of them throughout the --
24    the one you have, that's another one also.  I
```

21

1  probably drew several of them throughout my notes.
2  That's another one that you have in your hand.
3       That's another one that I did draw,
4  another one. Probably on the admission note,
5  which you're looking at, I probably drew another
6  one also just to give an idea of how the burn
7  was, just to have an idea.
8  Q. So the blister you were referring to, that was
9  pretty much on the top of the foot where the
10 shoelaces would tie?
11 A. No, kind of on the outer part of the foot, on the
12 edge. She got burned, the coffee went in her
13 sneaker. So it pooled along the edge. So it was,
14 sat in her sneaker. So it wasn't on the top.
15      From what I recall, it went along the
16 edge of her foot, and the blister kind of hung
17 down. So this is the top of her foot. This the
18 outer portion of her foot. This is the back of
19 the heel.
20      So it went along the edge, the outer
21 edge, then along the heel and then on the
22 inner -- on the other side up a little bit. So
23 it went right along the whole outer edge, along
24 the whole part of the outer foot (indicating).

22

1  Q. And so now you're just pointing to your foot after
2  you were pointing on the diagram of Exhibit 2, is
3  that right?
4  A. Right.
5  Q. And where was the blister located, do you recall?
6  A. This whole outer 8 by 10 centimeter on the outer
7  portion of her foot. And it, was, like hanging
8  down because it was filled with fluid. So until
9  it burst, like three days later or two days later,
10 it was a large, fluid-filled blister hanging down.
11 Q. And this picture obviously isn't drawn to scale,
12 is it?
13 A. No.
14 Q. Because that's certainly --
15 A. I'm not an artist, no. I'm a nurse. But that's
16 to give you an idea, no. No toes or anything, but
17 no, that's to show you.
18 Q. You would concede that 8 by 10 centimeters
19 wouldn't take up three-quarters of the foot?
20 A. No, of course not. That was just to show you
21 where the blister was and where it came around and
22 went into the inner aspect of the foot. Of
23 course, that's not 8 by 10. Of course, that's not
24 2 by 2.

23

1       It's just to show you it went on the
2  back of the heel and came in and went to the
3  inner side and came all the way to the outside of
4  her foot. And that blister was hanging down
5  until it burst.
6  Q. Now, with respect to the initial assessment, what
7  type of information are you looking for during
8  that initial assessment of the particular patient?
9  A. When I first go out, with any patient, I do a
10 complete assessment, head to toe assessment. She,
11 you know, cardiac, respiratory, if they're
12 diabetic. She was a young girl, so she was
13 healthy.
14      I believe other than being hypo -- she
15 had hypothyroidism, so she didn't have a whole
16 lot wrong with her. But I usually do blood
17 pressure, lungs, temperature. With her it was
18 mainly the burn was her main issue and pain
19 management and bowel management because of the
20 narcotics.
21      She was also nauseous and vomiting due
22 to the narcotic. So we concentrated on that. So
23 that was her main problem. So with her, it was
24 skin integrity, pain management, bowel management

24

1  and activity. Because of her burn, she couldn't
2  walk. She was on crutches.
3       So activity and tolerance, so those were
4  the issues with her that I concentrated on. She
5  didn't have any -- she was on crutches. So I
6  mean, she didn't have any respiratory problems.
7  So it was GI, vomiting, that type of thing. But
8  she was healthy otherwise, other than the thyroid
9  problem.
10 Q. Now, going back to Exhibit 1 during the
11 assessment, the pain assessment, what is the
12 purpose of a pain assessment?
13 A. Just to kind of get a general idea. I mean,
14 everyone has a different level of pain. Your pain
15 may be different from someone else's level of
16 pain, so just to find a general idea. I mean, she
17 may have just taken her medication, so her level
18 of pain at that time may have been 8.
19      She may have just taken two Percocet.
20 So 8 at that time, it's just to get an idea where
21 her level is at. If I had come and she hadn't
22 taken any pain medication, she may have been a
23 10. It's what time she had taken her medication
24 just to get a general idea.

**25**

1    At that time, I just got there, she may
2    have taken -- I was doing her dressing, so she
3    may have taken just two Percocet or Dilaudid,
4    whatever she was taking. So her level may have
5    been an 8. I usually say to people, on a scale
6    of 1 to 10, zero being no pain and ten being the
7    worst pain you've ever had, what's your level?
8        Well, she probably just took two pain
9    medications, two pills because she was having her
10   dressings changed. So she gave me a level 8.
11 Q. Do you find that this is very important to find
12   out what the pain level is?
13 A. I usually generally do.
14 Q. Then why would you -- did you make any notations
15   at all that she had just taken medication prior to
16   telling you that her pain level was 8?
17 A. I probably did in one of my notes. I believe I
18   did in one of my notes. If you go back -- I
19   probably didn't on this note; but in my notes, I'm
20   sure I documented -- I'm sure in one of my notes I
21   did.
22       I believe when I -- I believe in one of
23   my notes when I was reviewing my notes, it did
24   say that she did take the pain medication because

**26**

1    there's a spot, there's a spot in one of the
2    notes, a section that we put down when they took
3    their medications.
4        So I'm sure that I did put it. It would
5    be listed, but I don't recall exactly where. But
6    we do put down what time and usually where they
7    take the medication and what time on the notes.
8    If you give me one of my notes, I probably could
9    find it.
10 Q. What I'm going to do is I'm going to give you this
11   packet here of information that we received
12   pursuant to the subpoena that we had served upon
13   Partners or at least North Shore Medical Center.
14   Would you please take a look at that? You may be
15   able to find it a lot easier than I can.
16 A. Okay.
17       (Witness perusing documents.)
18 A. I have down what she's taking. She's taking one
19   every four to six hours here with Tylenol -- I
20   have down how she's taking it.
21 Q. Now, you're looking at a document which is dated
22   does that say 11/16/01?
23 A. Right. And then I also have my, the notes also.
24   I mean, when she -- you know, she's taking one to

**27**

1    two. I have it listed what she first, what the
2    doctor ordered. Then I also have how she's taking
3    it here.
4  Q. But my question posed to you is, How can you tell
5    whether or not when she told you that her worst
6    pain was an 8 on this particular pain assessment
7    chart of Exhibit 1 that she had taken medication
8    prior to your asking her?
9  A. Oh, okay. Let me see. I'm sure I've got it down
10   here.
11       (Witness perusing document.)
12 Q. Just to let you know, whenever you do refer to a
13   particular document, afterwards, I'm going to
14   state for the record what you're pointing to just
15   so I can clarify it for the record. Okay,
16   Miss Hovey?
17 A. I'm sorry, what did you say?
18 Q. I'm simply saying that I may -- I'm not going to
19   interrupt you; but after you refer to something in
20   a particular document, I'm going to state for the
21   record what it is you're pointing to just so I can
22   clarify it for the record.
23 A. Right ankle burns at rest with two Dilaudid, 10
24   milligrams with one Ibuprofen. With taking meds,

**28**

1    Q6 hours. This is on 11/13. This is the first
2    day, right here. That's on the 13th. I've got it
3    right here.
4  Q. Okay. And it says when she took it?
5  A. It says right here, right ankle burns at rest,
6    taking meds Q6 hours were two Dilaudids, 10
7    milligrams, and one Ibuprofen.
8  Q. What does that mean, Q6 hours?
9  A. Patient took two Dilaudid pills prior to dressing
10   change. It says it right here, right down here
11   too. Patient -- right down here. Patient took
12   two Dilaudid pills prior to dressing change.
13   Burns gently cleansed. And then that's the 13th.
14   That's the day I came out to see her.
15       Then it says right here, right ankle
16   burns, number 8. My level is number 8. That's
17   the 13th. So it's all right here. It's all
18   documented.
19 Q. When you say she took it before the dressing
20   change, is that before you arrived there and asked
21   her the pain questions?
22 A. No, I came to do the dressing change. So that's
23   when I -- and I asked the questions right before
24   I'm doing the dressing change. So she took the

29

1 pills before I did the dressing change.
2 Q. Okay. Was it right before the dressing change or
3     before you even arrived at the home?
4 A. I don't recall. But it says here, Patient took
5     two Dilaudid pills prior to dressing change.
6     Burns gently cleansed. And I did it right up
7     here. It says right here, taking meds Q6 hours,
8     two Dilaudid pills, number 8, 11/13. It's
9     right -- all documented right there.
10 Q. And in looking at this report that you filled out
11    on the 13th of November, is there a reason why you
12    circled 7 and 8 on the pain scale as opposed to --
13    you stated a number of times you circled 8. I was
14    wondering why you circled 7 and 8?
15 A. That's probably an error in my part. I mean, I
16    don't recall. I mean, that's -- I mean,
17    everything else says 8. I circled a 7 on that
18    one. Everything else says an 8.
19 Q. But is it fair to say that you did circle 7 --
20 A. That is fair to say. I did circle a 7 and an 8.
21 Q. And when do you write this particular report?
22 A. Usually when I'm there or when I get out in my car
23    or when I go back to the office. I don't recall.
24 Q. You certainly don't have the luxury of reciting it

30

1     in a tape and having someone transcribe it for
2     you?
3 A. No. But I recall writing that right away.
4 Q. Okay.
5         MR. ABRAMS: Can we take a short break?
6         MR. MERLINO: Certainly.
7         (Short recess taken.)
8 Q. Looking at, again, this Exhibit 1, pain
9     assessment. Upon admission, at the bottom, it
10    states "quality of pain." Excuse me, even prior
11    to that, it says, "frequency of pain, daily and
12    constant." Again, this is based on your
13    discussions with the patient?
14 A. I'm sorry. Oh, yes.
15 Q. How about the quality of pain too, is that based
16    on your discussion with her?
17 A. Yes.
18 Q. What does ADL stand for which I'm looking at under
19    subsection F?
20 A. Activity of daily living.
21 Q. And what do those entail exactly?
22 A. Bathing, dressing.
23 Q. Can you tell me what the higher numbers would tell
24    about that particular category? What does a scale

31

1     from 1 to 10 apply to, ADL's?
2 A. If you have -- I'm sorry, as far as pain?
3 Q. Why is it marked 8?
4 A. 8, because she said that she had pain that she
5     could not -- she was having pain getting out of
6     bed, getting dressed, moving around. She told me
7     it was an 8.
8         When I ask someone if you have -- on a
9     scale of 1 to 10, what is your pain level getting
10    dressed, getting out of bed, bathing, that's what
11    she told me the level was.
12 Q. So the --
13 A. Walking.
14 Q. So the number indicates the pain level --
15 A. The pain level --
16 Q. Let me just finish.
17 A. Sorry.
18 Q. It's okay. The number indicates the pain level
19    that the patient is experiencing while doing the
20    activity that's in the chart to the left, is that
21    right?
22 A. Yes.
23 Q. And you marked it an 8 because she was
24    experiencing what you believe to be a pain level

32

1     of 8 while she was doing the ADL's, what you were
2     just describing, right?
3 A. Yes.
4 Q. And what's the difference between ADL's and
5     physical activity?
6 A. Physical activity is more, I think, just trying to
7     walk with her crutches, walking around, walk to
8     the bathroom.
9 Q. And she had indicated to you that that was a pain
10    level of 8?
11 A. Yes.
12 Q. Now, was she experiencing pain with respect to
13    eating and preparing food?
14 A. Yes. She said she was.
15 Q. What exactly did she say?
16 A. She was not preparing food. Her husband was, but
17    she said she was having pain all the time. She
18    said she was having pain when she was sitting
19    there eating. You know, she was having pain, you
20    know, she said all the time.
21 Q. And that's also evident in the frequency of pain
22    where it says constant, is that right?
23 A. Right, yes.
24 Q. And obviously, with resting, sleeping, the pain

**Page 33**

1  was a five; as well as homemaking, it was an 8.
2  Is that right?
3  A. Right. She wasn't homemaking such as cleaning,
4     but she had little children. So trying to tend to
5     them as much as possible.
6  Q. She was on crutches at that time?
7  A. Yes.
8  Q. So when you visited her, would you ever teach her
9     how to navigate on the crutches at all? Is that a
10    part of your responsibilities?
11 A. Minimally.
12 Q. Do you remember whether or not she was on crutches
13    when you visited her?
14 A. I don't recall.
15 Q. So is it fair to say that she was not bedridden at
16    the time during the first initial visit?
17 A. Yes.
18 Q. One particular part on this same particular page
19    in which it says patient goal, what level of pain
20    is acceptable; what does that necessarily mean?
21 A. What level of pain -- oh, gosh. With the
22    medication, just what level of pain I guess is
23    acceptable to the patient with the medication.
24    Everyone, like I said, is different. It's what

**Page 34**

1  level of pain they, is acceptable to them. It's
2  just what it basically says.
3  Q. So when you ask them that particular question and
4     if they ask you to clarify what you mean by what's
5     acceptable pain, naturally, I would think someone
6     would want to have no pain. Why would 2 and 3
7     ever be put down as an acceptable level, do you
8     know?
9  A. I don't know.
10 Q. When someone asks you to clarify what you mean by
11    what's acceptable pain, what do you tell your
12    patients?
13 A. Well, most people, if someone has an injury and if
14    you have a bad injury or you're in pain, I don't
15    think you're ever going to be totally pain free.
16    So I tell them, to be comfortable, what's a level
17    of comfort for them that they could tolerate?
18 Q. During your initial visit with Mrs. Doucette, did
19    you talk about how the injury came about?
20 A. Yes.
21 Q. And what did she say?
22 A. Do you want me to tell you the whole story?
23 Q. Yes, please.
24 A. She told me that she was in Panera Bread with her

**Page 35**

1  son. I think she said it was in the morning. She
2  went into Panera Bread with her son to get
3  something. There was a worker there that, she
4  said it was a young teen that bumped into her with
5  a full coffee urn that spilled into her coffee --
6  I mean, into her sneaker. The full coffee urn
7  spilled into her sneaker.
8     She was in excruciating pain. It pooled
9  into her sneaker. She said that the young boy
10 was horrified, obviously. She said there was a
11 young -- there was a nurse that happened to be in
12 Panera Bread at the time that was smart enough to
13 take her sneaker off and put, I don't know
14 whether it was ice or cold cloths on her foot
15 until the ambulance arrived.
16    And she said that her son was horrified,
17 and she was screaming. And it was painful and
18 excruciating. And the ambulance came, and that
19 was basically it. And they were, obviously, the
20 worker was, felt terrible. It was an accident.
21 Q. Other than her saying that a young teen bumped
22    into her and then spilled the coffee onto her foot
23    that went into her sneaker, was there anything
24    else that she said about that particular accident?

**Page 36**

1  A. I just know -- no. She just said that, you know,
2     she went in there. No, she just said that he
3     bumped into her, and he spilled it. And he was
4     horrified and apologetic, and she was screaming.
5     And she said she was in excruciating pain, that
6     she was screaming; that a nurse came over and took
7     her sneaker off.
8        She said her son was crying. She was
9     screaming. They called an ambulance. The nurse
10    knew enough to take her sneaker off because it
11    was just pooled in her sneaker. I just remember
12    that. Everyone felt terrible, and they called
13    911.
14       I think they knew enough not to put ice,
15    but they put, like, cool compresses or something
16    like that on it and took her to the hospital.
17 Q. Did you ever talk to that nurse who treated her at
18    the Panera Bread?
19 A. No, no. I don't even know if she got the nurse's
20    name. I don't know. It just happened to be a
21    nurse that was in there that morning.
22 Q. Do you know during that initial visit whether or
23    not you spoke to Mr. Doucette?
24 A. Yes, he was there, I believe.

37

1  Q. Did you talk to him about what happened at Panera
2     Bread?
3  A. No. He was watching the children, I believe. She
4     had three little children. They were running
5     around. So he was trying to watch them, I
6     believe.
7  Q. Did you ever have any discussion with Mr. Doucette
8     about what happened at Panera Bread?
9  A. No, no. I don't recall, no.
10 Q. Do you remember what Mr. Doucette did for a
11    living?
12 A. I think computers, something with computers.
13 Q. Do you know what Mrs. Doucette did for a living?
14 A. She was a lawyer.
15 Q. And why is it important for you, at least during
16    the initial assessment, to find out exactly what
17    the pain levels are that the person's
18    experiencing?
19 A. Just to make sure that the medication is treating
20    her, so if it's the right medication especially
21    with her because she was saying that she had so
22    much pain, to make sure she was on the right
23    medication. Maybe that medication is not working,
24    call the doctor, maybe get something else if it's

38

1     not working for her. She might need something
2     else, a different medication, something stronger,
3     something else.
4  Q. And when she indicated on this assessment form
5     that the pain was a five at best, do you recall
6     what conditions there were that the pain was
7     actually at a five? What made her feel that the
8     pain was at a five at certain times; that is, if
9     the pain was constant? I was wondering if you
10    might be able to explain that to me?
11 A. It's somewhat -- it's hard to remember because she
12    had a reaction to the pain medication. She even
13    went back, I think, to the doctors for an
14    injection or something in between. So I don't
15    recall. I think she might have even gone back to
16    the emergency room at the beginning for something
17    else. I don't know.
18       I don't know if maybe she felt more
19    comfortable, because like I said, she took
20    something, you know, before I came. It might
21    have been at a different time that I came. So
22    maybe she just took two pills when I got there so
23    it was a less, so it wasn't as painful. You know
24    what I'm trying -- I don't remember.

39

1  Q. But when she describes that her pain is at a five
2     at its best, do you ever ask them or did you ever
3     ask her what she is doing or what she is taking
4     that actually would make her say that her pain is
5     best at a five in order to somehow actually
6     replicate that and make sure -- --
7  A. It might have been -- she was also taking
8     Ibuprofen, supplementing with the pain medication.
9     It might have been that. She might not have been
10    walking on it as much at that time. I don't know.
11    It might have been, you know -- I don't recall.
12       It might have been the dressing might
13    not have been changed at that time. I mean, it
14    hurts more when you change the dressing. So it
15    might have, you know, been a couple of hours
16    before the dressing was changed. She might not
17    have been walking on it.
18 Q. You have marked down here that it was a second
19    degree burn, is that right?
20 A. Right.
21 Q. What are some of the characteristics of a second
22    degree burn?
23 A. The second degree is usually when it's just a
24    large blister. It's when the skin blisters. The

40

1     first degree is usually when it's just red. The
2     second degree is when it's blistering. The third
3     degree is when the tissue is dark and blackened.
4  Q. Have you ever worked with particular patients with
5     home care who have had second degree burns?
6  A. Yes.
7  Q. And with respect to those, how many other times
8     have you done that?
9  A. Multiple. I don't recall, but numerous times.
10 Q. And with respect to comparing this to those, to
11    other incidents in which you help people with
12    second degree burns, how would you rate this one
13    amongst some of them?
14       MS. BARMACK: Object to the form.
15 Q. With respect to the level of severity, if you can
16    answer?
17 A. Size wise, it was large. It was probably larger
18    than some of them that I've seen. But second
19    degree -- I've seen second degree burns. It was a
20    second degree burn which I've seen before, but it
21    was a large burn. It was a pretty large burn.
22 Q. And was the pain level that she was experiencing
23    comparable to what other people experience with
24    second degree burns?

Page 41

1  A. She probably had a little more pain. But again,
2     people have different levels of pain. Everyone's
3     different.
   Q. Other than people just being very different, is
5     there anything else that would make you think that
6     this pain level would be higher than some of the
7     other ones that you've dealt with?
8  A. She also had a reaction to the pain medication
9     which I think made it worse for her. She was
10    nauseous and vomiting. So I think that just made
11    it a lot worse for her. So I think that just the
12    nauseous and the vomiting, I think that just made
13    the whole thing a lot worse for her.
14 Q. But the vomiting and the reaction to the pain
15    medication wouldn't have increased --
16 A. The pain.
17 Q. -- the pain in her foot, would it?
18 A. No.
19 Q. Looking at what's been marked as Exhibit 1 in this
20    particular deposition, the first page; that is, at
21    the top, is it fair to say that the letters DC are
22    circled at the top?
23 A. Yes.
24 Q. So this is the pain assessment upon discharge, is

Page 42

1     that right?
2  A. Yes.
3  Q. And it's dated 11/19/01. Would that have been
4     after her final, your final visit?
5  A. Yes.
6  Q. In it, she indicates that the pain at worst is to
7     9 plus. Can you explain why the pain actually
8     went up one or even more than one since the
9     initial visit?
10 A. She still had pain. She still stated she had
11    pain.
12 Q. Did you notice during your visits there as the
13    days went by that her pain level was increasing?
14 A. She said she still had pain.
15 Q. My question to you is, During the five days that
16    you were treating her, isn't it fair to say that
17    you actually noticed that her foot was getting
18    better?
19 A. Yes.
   Q. And did you also make observations that the pain
1     that she was experiencing from the first visit,
2     actually the frequency went down as more time went
3     by with you treating her?
4  A. Yes.

Page 43

1  Q. As a matter of fact, with respect to the frequency
2     of pain that's on that same page, it no longer is
3     marked constant; but rather, daily and
4     intermittent. Am I reading that correctly?
5  A. Yes.
6  Q. Is that based on not just what she said but also
7     what you noticed?
8  A. Yes.
9  Q. And with respect to the quality of pain, that
10    seems to have changed as well from a stabbing and
11    throbbing, which is marked on Page 2, to a sharp
12    and stabbing that's marked on the first page upon
13    discharge. Am I reading that correctly?
14 A. Yes.
15 Q. And is that based on what she was telling you?
16 A. Yes.
17 Q. So looking at Subsection F in which the numbers
18    listed are 4, 4, 2, 2, 4, after your treating her
19    for five days, her pain level cut in half, even
20    more than half from your initial visit; isn't that
21    fair to say?
22 A. Yes.
23 Q. Can you please explain why her pain level dropped
24    so dramatically after your five days of treating

Page 44

1     her?
2  A. She said she still had pain.
3  Q. Right. But you'll concede that --
4  A. From examining her and from visiting her and from
5     talking to her, those are the levels that I put
6     down. But when I ask someone what their intensity
7     of pain is, I put down what she tells me. And she
8     told me she had a lot of pain. So I have to put
9     down what someone tells you.
10 Q. Sure. So in Subsection F where it says 4, 4, 2, 2
11    4, right, these are the pain levels that
12    Mrs. Doucette told you?
13 A. She tells me, and I also -- right. And I also,
14    with the two of us, with the two of us also, I
15    mean, I look at what she's doing also. I kind of
16    can look at what she's doing also. But she tells
17    me.
18 Q. Just to be clear, when you were going through this
19    particular record, do you actually ask her what
20    level of pain she is experiencing when she is
21    engaged in homemaking or these various things, and
22    then you write down her answer? Or is it more of
23    a corroborated number that's --
24 A. Corroborated.

**45**

1  Q. Okay. Collaborated?
2  A. Collaborated.
3  Q. I misspoke.
   A. Excuse me, I did too.
5  Q. No, I misspoke.
6  A. I did too. Sorry.
7  Q. Unfortunately, the record already has it. So we
8     can't change the record.
9         Can you just explain then how this
10    particular number 4 came about with respect to
11    her daily living activities?
12 A. I don't know.
13 Q. So when you were there for the five days, you
14    stated earlier in a previous answer, I believe,
15    and I certainly don't want to put words in your
16    mouth; but during the five days, you certainly did
17    notice that she was getting better?
18 A. Yes.
19 Q. What type of observations did you make that would
20    lead you to conclude that she was getting better?
21 A. Well, her wound got -- her wound did get -- I
22    mean, her wound started to heal. The blister
23    resolved. The blister gradually resolved. The
24    fluid drained. And this I don't recall, I think

**46**

1  the doctor -- she may have gone to the doctor.
2         I think the doctor may have removed the
3  skin, which is common. In burns, they remove the
4  skin, the dead skin. And it healed. At the end
5  of the week, she did not need me anymore. And
6  the doctor didn't think she needed me anymore.
7         I felt she was doing fine, and I
8  discharged her. I thought she was doing okay.
9  She still thought she was having a lot of pain,
10 but I thought she was doing okay.
11 Q. What made you think she was doing okay despite the
12    fact that she was --
13 A. Because I think she was -- pardon?
14 Q. No, it's okay. What made you believe that she was
15    doing okay despite the fact that she stated that
16    she was still experiencing a lot of pain?
17 A. Her mood or affect. She was eating. She wasn't
18    nauseous. She was up walking a little bit better,
19    more talkative. The dressing didn't hurt as much
20    when you did it, when you changed the dressing.
21    It wasn't as painful.
22 Q. So it is fair to say that when you're working with
23    someone as closely as you do over a period of five
24    days and you're engaged in changing dressings and

**47**

1  helping them stand up, things of that nature,
2  you're able to make observations as to whether or
3  not they are experiencing pain; is that fair to
4  say?
5  A. Yes.
6  Q. And is it also fair to say that when she did
7     experience pain, maybe more so in the beginning,
8     she was very vocal about the pain she was
9     experiencing?
10 A. Yes.
11 Q. She wasn't, like, pardon me for the example, but
12    maybe a very proud young man who might not want to
13    show his emotions, you feel that she was very open
14    about when she felt her pain; is that fair to say?
15 A. Yes.
16 Q. And as the five days went along, it's fair to say
17    that during those five days, the amount of time
18    that she would express to you this pain that she
19    was experiencing, those times that she did that
20    were reducing in the frequency?
21 A. Yes.
22 Q. And that is another reason why you came to the
23    conclusion that she was doing okay and that she
24    was better than what she was the first time you

**48**

1  saw her?
2  A. Yes.
3  Q. Now, is there any --
4         MR. ABRAMS: Just keep going.
5  Q. Now, is there anyplace in any of your records in
6     which you wrote down your estimation as to the
7     pain level that she was experiencing, not based on
8     what you asked her?
9  A. I'm sorry, will you restate that?
10 Q. Sure. Is there anywhere in your, in the nurse's
11    notes in which you would write down what the pain
12    level was based on your observations and your
13    working with her and not based on your discussions
14    with her and her statements that it was an 8 or 9?
15 A. So in my words, would I put down what her pain
16    level was, like, in my words?
17 Q. Yes.
18 A. I don't think so. I don't recall. I don't think
19    I would do that.
20 Q. So what looks, what's staring at me at least on
21    this particular Exhibit 1 is all these
22    designations of 4's and 2's on the pain scale; and
23    below, she writes, 8, 9 plus with respect to the
24    intensity of pain. Can you please explain that

**Page 49**

1 discrepancy?
2     MS. BARMACK: Object to the form.
3     MR. MERLINO: If you can answer. If I
4 may, Attorney Barmack objected to the form of the
5 question, the way I asked it. You can still
6 answer it if you know how to -- you can still
7 answer it. If not, I'll be more than happy to
8 rephrase it for you.
9     MR. ABRAMS: It's up to you.
10 A. Again, that's just what she's telling me. That's
11 just her level of pain that she's telling me. I
12 mean, if a patient's telling me that's her pain
13 level, that's what I have to go by. I mean, I'm
14 not going to write somewhere what I think someone
15 has for pain. I mean, I can write all I want that
16 someone's not having pain, but it's what she's
17 telling me.
18 Q. And so it was what she was telling you that made
19 you write down at the bottom here in Subsection F,
20 if I may finish, that's a 4, 4, 2, 2 and a 4?
21 A. Right. As I do feel that the wound was getting
22 better and it was healing and it did heal and she
23 was getting better, and it was, you know, wounds
24 do heal. And burns do get better, but she still

**Page 50**

1 stated she was having pain.
2     But she was getting around a little bit
3 better. I noticed that. She was walking better.
4 She was not using her crutches as much. She
5 was -- the dressing didn't hurt as much. It was
6 resolving. There was less drainage. So I mean,
7 all that, as far as nursing, I see that getting
8 better.
9     But you know, intensity of pain, she
10 tells me that she's an 8 to 9, I'm going to put
11 that down.
12 Q. Sure. But it's fair to say that if you were to
13 put 8 or 9 under ADL's, physical activity, eating,
14 food and those under Subsection F, it's fair to
15 say that if that's an 8 or 9 plus, she wouldn't
16 have been discharged at that time; is that right?
17 A. No, I still would have discharged her.
18 Q. Why is that?
19 A. Because I wouldn't have kept her on just for the
20 pain management because I was there not -- I'm not
21 there just for pain. I'm there for her wound, and
22 her wound -- I was there to take care of her
23 wound. Pain management, she can go to her doctor
24 for pain management.

**Page 51**

1 I'm there to treat her wound and for
2 signs and symptoms of infection and for dressing
3 change. If it's for pain, she can go to her
4 doctor and be treated for outpatient and see her
5 doctor and be treated on an outpatient basis for
6 her pain. I'm there for dressing and for wound
7 care.
8 Q. You said that she noticed that she was getting
9 around a lot better and sometimes not using her
10 crutches?
11 A. Toward the end, yes.
12 Q. When did you first notice her using the crutches?
13 A. I don't recall. I don't remember.
14 Q. When you say that she wouldn't use the crutches,
15 in what circumstances would she not use the
16 crutches?
17 A. When she was vomiting and was trying to get to the
18 bathroom to vomit, when she had to get to the
19 bathroom when she was sick.
20 Q. Other than that, would you ever see her walking
21 around the house without the crutches?
22 A. I don't recall.
23 Q. Earlier, you testified that there were instances
24 in which she was getting around better on the

**Page 52**

1 crutches, and she wasn't using the crutches. And
2 that was one of your, one of the reasons why you
3 thought that she was improving.
4     Can you please describe what instances
5 in which she was using the crutches better and
6 that she wasn't using them at all?
7 A. Well, I say I don't recall. You know, I'm just --
8 I'd be guessing, but I do think I remember her
9 maybe walking from the bed, around the bedroom,
10 maybe limping without them. And I'm guessing, but
11 I remember her maybe limping on her foot. She
12 really couldn't put too much weight on it.
13 Q. Okay. And most certainly, neither I or Attorney
14 Barmack or anyone here wants you to guess, okay.
15 So if you sit here today and you do remember her
16 sitting around the bed, please -- not sitting
17 around the bed, like walking around the bed area,
18 please tell us. I don't want you to guess.
19 A. Then I would have to say I don't recall. That's
20 why I said I don't recall.
21 Q. Okay. Is there anything that would lead you to
22 believe that you did see her walking around the
23 house a little bit?
24 A. No, because her husband I think used to walk me to

**Page 53**

1  the door. I don't remember -- no.
2  Q. Since the 19th, your last day there, have you ever
3     spoken to Mrs. Doucette?
   A. No.
5  Q. Have you ever spoken to Mr. Doucette?
6  A. No.
7  Q. Now, at any time would you be able to observe
8     Mrs. Doucette engaged in any of these activities
9     of daily living while you were there with her?
10 A. Attempting to eat, sleeping in bed, eating, maybe
11    attempting to, like, wash maybe in bed or, you
12    know, her husband may have brought her something
13    to get washed up in bed or something to eat in
14    bed.
15       I recall her sister -- now that I
16    recall, her sister was staying with her too. So
17    actually, her sister was staying with her now
18    that I recall. Her sister was helping her too.
19    That's right. She had a sister who was with her.
20       I think it was her sister, and she was
21    helping with the three little kids. So she was
22    helping out. That's who was taking care of the
23    kids. There was a sister there.
24 Q. So what was the husband doing then?

**Page 54**

1  A. I don't know.
2  Q. That's --
3  A. I think he worked at home. I think he worked at
4     home. I think they both worked out of home. I
5     think they both worked out of home, as a matter of
6     fact.
7  Q. I know that was a very odd question.
8  A. Yeah, I think they both worked out of their house.
9     I think now -- I think they both worked at home.
10 Q. In looking through some of your records, I notice
11    that you write a particular acronym, I believe, of
12    SNV or SNY. What are those?
13 A. SVN, Salem visiting nurse, skilled nursing
14    visits -- skilled visiting --
15 Q. I'll show you what's been marked as Exhibit 5 in
16    Miss Doucette's deposition, and it's the second to
17    last page, Page 9 of 10 on that particular one.
18 A. This one here?
19       MS. BARMACK: The initial one or
      discharge one?
21       MR. MERLINO: It's the discharge which is
22    marked as November 19th, 2001.
23 A. Skilled nursing visits QD, daily skilled nursing
24    visits.

**Page 55**

1  Q. And what does QD stand for?
2  A. Daily.
3  Q. Okay.
4  A. For dressing change to right foot.
5  Q. And this document that I'm showing you, is this
6     the discharge assessment that you drafted on or
7     about the 19th of November?
8  A. Yes.
9  Q. Now, you said you visited her five times. These
10    were five days in a row?
11 A. No. I don't recall. Other nurses probably saw
12    her in between. She may have been twice a day,
13    and she may have had other nurses also seeing her
14    besides me.
15 Q. Did you ever consult with those other nurses about
16    observations that they made?
17 A. They probably left me notes on my voice mail. I
18    don't recall exactly the message. But we usually,
19    after a nurse sees a patient, if I'm a case
20    manager, they will leave me a message that they
21    saw her. And this is what they did, and this is
22    what they saw. They'll leave me a message.
23 Q. It's fair to say one of the reasons they do that
24    as well is this was your particular patient,

**Page 56**

1     right?
2  A. Yes.
3  Q. And you would most likely be the person filing the
4     discharge transfer or report?
5  A. Yes.
6  Q. Do you remember which nurses helped you or at
7     least helped Mrs. Doucette during that week?
8  A. The notes, if someone else saw her, there should
9     be notes. The notes should be in here. If
10    someone else saw her, the notes would be listed.
11 Q. I'll just show you what's been marked as -- it's a
12    report dated 11/18/01. At the bottom, there is a
13    name next to Taramattie Doucette's. Do you know
14    whose name that is?
15 A. I think I do.
16 Q. Who is that?
17 A. I think it might be Sue Bucklin.
18 Q. And how do you spell her last name?
19 A. B-U-C-K-L-I-N.
20 Q. Does she work for Partners still?
21 A. Yes, she does.
22 Q. Have you ever seen that particular report before?
23 A. No.
24 Q. At some point, you spoke to -- excuse me, strike

57

1  that.
2       At some point, did you speak to
3  Mrs. Doucette's treating physician about the
4  pending discharge?
5  A. I don't recall. I don't recall. Most likely, but
6     I don't recall. There is a discharge note from
7     him on one of the pages that he signed to
8     discharge her. There's a note to discharge her
9     that he wrote thank you. Top page, I believe.
10        MS. BARMACK: Could we go off the record
11    for a second?
12        MR. MERLINO: Sure.
13        (Discussion off the record.)
14 Q. I'm just showing you -- well, first of all, you
15    were mentioning the top page. Can you please tell
16    me what you were referring to earlier?
17 A. I believe it might be that one. I'm sorry, this
18    top page here that you just gave me --
19 Q. So the top page?
20 A. -- where it says "needs no further visits."
21 Q. "Healing well, needs no further visits, thank
22    you." That's the treating physician?
23 A. I don't know.
24 Q. I just want to show you one other progress report

58

1  addendum. It looks like it's dated November 19th
2  in which it says, "Received a message from
3  patient's SP." Could you please tell me what this
4  particular report says?
5  A. "Received message from patient's spouse that
6     patient saw MD. Received message from patient's
7     spouse that patient saw MD 11/19, and skilled
8     nursing visits were no longer needed. Discharge
9     from skilled -- S, Salem Visiting Nurse
10    Association, with last skilled nursing visit
11    11/18/01."
12 Q. So that was based on a discussion with
13    Mr. Doucette, I imagine?
14 A. Yes.
15 Q. Other than that, did you receive any other
16    confirmation from a physician indicating that the
17    treatment was no longer necessary?
18 A. I don't recall.
19 Q. So what made you put together the discharge
20    assessment? How did you find out that you were no
21    longer going to have to work over there?
22 A. Probably, probably spoke to the doctor and the
23    spouse and probably the doctor, but I don't
24    recall. I usually talk to the doctor. I usually

59

1  talk to the patient after they see the doctor.
2  I usually talk to the patient and find
3  out what the doctor's office said; and then
4  usually I'll call the doctor's office, and say
5  I'm discharging so and so. Is that okay? And
6  then I discharge the patient. I just don't
7  recall the exact, how it went.
8  Q. So when you put together this, what's been marked
9     as Exhibit 1, the final discharge report, is that
10    done on your last visit?
11 A. Not the last visit. I usually -- it depends. She
12    was not -- I did not discharge her at the house.
13    I discharged her I think by telephone or by
14    talking to her. I can't recall. I don't
15    remember.
16 Q. Would you ever have put together that particular
17    report as Exhibit 1, the discharge pain assessment
18    summary, would you have ever done that without
19    consulting the patient?
20 A. No. No, I would talk to her. I had talked to her
21    about discharging her and everything. I remember
22    because she thought she was going to stay on a
23    little bit longer, and I talked to her. I said if
24    the doctor signed the discharge order, I wouldn't

60

1  be coming back. So we had planned on that I
2  probably would discharge her, and we had talked
3  about it.
4  Q. Okay. Do you specifically remember talking to her
5     and filling out this particular pain assessment
6     form with her?
7  A. I don't remember. I don't remember. It's too
8     long ago.
9  Q. And looking back at these reports, I see marked
10    for November 17th, '01, just to clarify, this is
11    Sue Bucklin's signature as well; is that right?
12 A. I don't know.
13 Q. You don't know?
14 A. I don't know. I don't know. I mean, I guess. I
15    don't know.
16 Q. Would it be fair to say that they're at least the
17    same initials as the 18th which you already stated
18    was Sue Bucklin?
19 A. Yes, yes.
20 Q. So between the 13th and the 19th, you treated
21    Mrs. Doucette everyday but for the 17 and 18th; is
22    that right?
23 A. Yes.
24 Q. Can you tell me what you know about neuropathic

61

1  pain? Have you ever heard of that term before?
2  A. Neuropathic pain. I don't -- I don't know if
3     that's pain from an injury, from an old injury
4     that people have afterwards, I think.
5  Q. Have you --
6  A. I've never treated anyone who's had it, but I
7     think it might be pain that someone has after they
8     have an injury that comes back or they have
9     afterwards. I'm not sure. Sorry.
10 Q. It's okay. That wasn't a personal question by the
11    way.
12 A. Oh.
13       MR. MERLINO: I don't have anymore
14    questions for now. I may have a little bit more
15    after Attorney Barmack. I appreciate your help,
16    and I'll turn it over to Miss Barmack.
17       THE WITNESS: Okay.
18       MS. BARMACK: I don't have a whole lot.
19       THE WITNESS: Okay.
20       **CROSS EXAMINATION**
21    **BY ATTORNEY BARMACK:**
22 Q. I understand that one of the reasons that you came
23    to Mrs. Doucette's home was to help her with wound
24    dressing?

62

1  A. Yes.
2  Q. What did that entail?
3  A. It was a daily dressing. We cleansed it with
4     normal saline, then put Silvadene, which is a burn
5     ointment, and then a non-stick dressing and
6     wrapped it with Kerlix and a stocking net over it.
7  Q. Is that a painful procedure for the patient?
8       MR. MERLINO: Objection.
9  Q. You can answer if you understand.
10 A. Yes.
11 Q. Why?
12 A. I think burns are painful. I mean, cleaning it
13    and taking off the dressing is painful. I think
14    until the -- and cleaning it is painful.
15    Cleansing it is painful.
16 Q. And that had to be done once a day?
17 A. Yes.
18 Q. And was it your understanding that there was not
19    going to be any more wound dressing after you
20    left, or were you turning that over to Tara? What
21    was your understanding about what happened?
22 A. I believe that the husband was going to continue
23    doing some of the dressings. We taught them how
24    to do the dressing. And I don't recall exactly

63

1  what the dressing was, but it might have been like
2  a dry sterile dressing that they were going to
3  keep protecting it and just watch for signs of
4  infection afterwards and do the dressing.
5  Q. Would they have to do any kind of a cleansing as
6     well?
7  A. I don't remember if it was still draining. If it
8     was still draining, they would have to cleanse it
9     with saline. If it were dry, they wouldn't. If
10    it were draining, they would be cleaning it with
11    saline and keeping it covered. It also depends on
12    what the doctor's order was.
13 Q. On your, let's see, nursing note of November 13th,
14    it was probably your first nursing note, I've sort
15    of lost track of which exhibit it is, but it's the
16    one that looks like this?
17       MR. MERLINO: If I may, that has not been
18    offered as an exhibit. If you want, we can have
19    this packet of materials that we've been referring
20    to marked as Exhibit 3.
21       MS. BARMACK: Sure, that will be fine.
22       (Document was marked as Exhibit No. 3
23    for identification.)
24 Q. Okay. Now, about three quarters of the way down

64

1  the page --
2  A. I don't know if this is the right -- 11/13?
3  Q. Right.
4  A. Okay.
5  Q. There's text down here. It says, "outcome/goals
6     review." Do you see where I am?
7  A. Mm-hmm.
8  Q. There's a notation, it looks like elevation of the
9     foot. Is that what that little arrow means?
10 A. Elevate foot as much as possible.
11 Q. Now, why is that important?
12 A. Because you want the swelling to go down, and you
13    want her to stay off of it for pain management.
14    And you also want the swelling of the foot to go
15    down. When you have an injury, the foot is
16    swollen. So you want the swelling to go down, and
17    for pain.
18 Q. So did that mean that you were advising her to
19    basically stay either in bed or on a couch or a
20    chair or something where she could keep her foot
21    up?
22 A. Yes.
23 Q. And as far as you know, did she try to maintain
24    that regimen during the week that you were looking

Page 65

1  after her?
2  A. Yes.
3  Q. Okay. Do you know whether she had to continue to
4     keep her foot elevated even after you left?
5  A. I don't know. I don't know that.
6  Q. You previously testified that in your experience,
7     patients have different individualized responses
8     to wounds in terms of how much pain they
9     experience?
10 A. Yes.
11 Q. So it's kind of a subjective matter how a person
12    tolerates pain?
13 A. Yes.
14 Q. Okay. Did you have any reason to believe that
15    Mrs. Doucette was exaggerating in any way the pain
16    that she was feeling?
17          MR. MERLINO: Objection.
18 Q. I mean, when she was describing to you how she
19    felt?
20 A. Slightly. A little.
21 Q. What do you mean by that?
22 A. I thought she was saying she had a little bit more
23    pain than she, for the injury she had.
24 Q. Okay. Despite the fact that each person's

Page 66

1  response to pain is an individualized response?
2  A. I just, I just thought that she -- from the very
3     beginning, I thought the very first day, I thought
4     she was just saying she had a little bit more pain
5     from day 1. It's just my opinion.
6  Q. Than you thought she was actually experiencing?
7  A. Yeah, yes.
8  Q. Did you have any doubts that she was nauseous and
9     vomiting and so forth?
10 A. No, no.
11 Q. And did you have any doubts that she was having
12    difficulty getting around the house?
13 A. No.
14 Q. Or looking after her children?
15 A. No, not at all.
16 Q. Do you know if Sue Bucklin is still working for
17    Partners?
18 A. She is.
19          MS. BARMACK: Okay. That's all I have.
20    Thanks.
21          THE WITNESS: Okay, thank you.
22          MR. MERLINO: I just have a few
23    follow-ups.
24          THE WITNESS: Sure, yes.

Page 67

1          REDIRECT EXAMINATION
2  BY ATTORNEY MERLINO:
3  Q. The thought that the patient was slightly
4     exaggerating her pain from your initial visit, do
5     you believe that she was slightly exaggerating her
6     pain throughout the treatment while you were
7     helping her?
8  A. No.
9  Q. Just that initial visit?
10 A. Yes.
11 Q. Then perhaps was her slight exaggerating of the
12    pain during the initial visit, did that have
13    anything to do with the discharge discrepancy in
14    which her worst pain was 8 or 9 plus, and all the
15    other pain during all that other activity was
16    described as a 4 to a 2?
17 A. I don't know.
18 Q. So it's your testimony today that your evaluation
19    upon discharge, you don't believe that she was
20    exaggerating her worst pain to be 8 to 9 plus?
21 A. I think she was in a lot of pain. She had a bad
22    burn. It was very severe. I think she had a bad
23    pain -- I mean, a bad burn. She was in a lot of
24    pain. I think she seemed like maybe she had a

Page 68

1  little bit more pain than someone that I've
2  treated in the past. But it was a bad burn, and
3  she's entitled to have pain.
4  Q. Well, you've been a nurse for --
5  A. 18 years.
6  Q. 18 years. So you've worked with a lot of people
7     who've been experiencing different levels of pain,
8     is that right?
9  A. Yes.
10 Q. And as a matter of fact, earlier, you testified
11    that you've worked with numerous or multiple
12    people with second degree burns before, right?
13 A. Yes.
14 Q. And based on all that experience, there was
15    something about your treatment of her and things
16    about, either things that she said or did that
17    made you think that she was slightly exaggerating;
18    is that right?
19          MS. BARMACK: Object to the form.
20          MR. ABRAMS: You can still answer.
21 A. Yes.
22          MR. MERLINO: I don't have any other
23    questions.
24          MS. BARMACK: Neither do I.

69

1  (Whereupon, the deposition concluded at
2  12:05 p.m.)

---

70

1  I, PAULA CHILDS HOVEY, having read the
2  foregoing transcript of my testimony, do hereby
3  certify the same contains a true and accurate
4  record of my answers to the questions herein set
5  forth, together with correction pages, if any,
6  attached.

8  Signed under the pains and penalties of perjury
9  this _____ day of _____, 2005.

13  _____
     Deponent's Signature

18  Subscribed and sworn to before me
19  this _____ day of _____, 2005.

    _____
22  Notary Public

---

71

1           CERTIFICATE

2  COMMONWEALTH OF MASSACHUSETTS
3  ESSEX, SS.

4      I, Christine L. Warwick, a Registered
   Professional Reporter, Certified Shorthand
5  Reporter, and Notary Public duly commissioned and
   qualified in and for the Commonwealth of
6  Massachusetts, do hereby certify that there came
   before me on the eleventh day of April, 2005, at
7  10:30 a.m. the person hereinbefore named, who was
   by me duly sworn to testify to the truth and
8  nothing but the truth of her knowledge touching
   and concerning the matters in controversy in this
9  cause; that she was thereupon examined upon her
   oath, and her examination reduced to typing; and
10 that the deposition is a true record of the
   testimony given by the witness.
11
       I further certify that I am neither
12 attorney or counsel for, nor related to or
   employed by, any of the parties to the action in
13 which this deposition is taken, and further that I
   am not a relative or employee of any attorney or
14 counsel employed by the parties hereto or
   financially interested in the action.
15
       IN WITNESS WHEREOF, I have hereunto set
16 my hand and Notarial Seal this nineteenth day of
   April, 2005.
17

18 _____
   CHRISTINE L. WARWICK
19 Registered Professional Reporter
   Certified Shorthand Reporter
20 Notary Public

21 My Commission Expires:
   May 14, 2010
22
   THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
23 DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY
   ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
24 DIRECTION OF THE CERTIFYING REPORTER

---

72

1           COPLEY COURT REPORTING
               101 Tremont Street
2           Boston, Massachusetts 02108
                 (617) 423-5841
3

4  Date:  April 19, 2005
5
   To:    Joseph A. Merlino, Esquire
6         DAVIS, WHITE & SULLIVAN, PC
          One Longfellow Place, Suite 3609
7         Boston, MA 02114

8  IN RE:  DOUCETTE vs PANERA, INC.
           DEPOSITION OF PAULA HOVEY
9
   Dear Mr. Merlino:
10
       Enclosed herewith is your original
11 transcript of the deposition of Paula Hovey,
   Volume 1, Pages 1 through 71, taken on Monday,
12 April 11, 2005 in the above-mentioned case. Also
   enclosed are the signature pages. Would you
13 kindly arrange at your convenience to have
   Ms. Hovey read the transcript and sign the
14 signature pages. Please return one signature page
   to Atty. Barmack including a copy of any errata
15 sheet with the signature page.
       Thank you for your anticipated
16 cooperation. If you have any questions, please
   feel free to call on me.
17
       Very truly yours,
18

19
           Christine L. Warwick
20
   Enclosure
21 CC: Margaret G. Barmack, Atty-at-Law